# UNITED STATES DISTRICT COURT

SOUTHERN District of NEW YORK

**ECF CASE**

JEROME SCARDINO,

Plaintiff(s),

**SUMMONS IN A CIVIL CASE**

- against -

CIGNA LIFE INSURANCE COMPANY OF NEW YORK, CONTINENTAL GRAIN COMPANY LONG-TERM, DISABILITY BENEFIT PLAN, CONTINENTAL GRAIN COMPANY BASIC LIFE INSURANCE PLAN, CONTINENTAL GRAIN COMPANY SUPPLEMENTAL LIFE INSURANCE PLAN, CONTINENTAL GRAIN COMPANY DEPENDENT LIFE INSURANCE PLAN, CONTINENTAL GRAIN COMPANY RETIREMENT PLAN, CONTINENTAL GRAIN COMPANY ACCIDENTAL DEATH INSURANCE PLAN, and CONTINENTALGRAIN COMPANY TRAVEL ACCIDENT PLAN,

Defendant(s).

Civil Action No.

**05 CV 2615**

**JUDGE KARAS**

TO: (name and address of defendants)

SEE ATTACHED SHEET

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY. (name and address)

BINDER & BINDER, P.C.
2805 Veterans Memorial Highway
Suite 20
Ronkonkoma, New York 11779

an answer to the complaint which is herewith served upon you, within __20__ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**J. MICHAEL McMAHON**

CLERK

(BY) DEPUTY CLERK

MAR – 7 2005

DATE

NAMES AND ADDRESSES OF DEFENDANTS:

CIGNA LIFE INSURANCE COMPANY OF NEW YORK
140 East 45th Street
New York, New York 10017                    New York County

CONTINENTAL GRAIN COMPANY LONG-TERM DISABILITY BENEFIT PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

CONTINENTAL GRAIN COMPANY BASIC LIFE INSURANCE PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

CONTINENTAL GRAIN COMPANY SUPPLEMENTAL LIFE INSURANCE PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

CONTINENTAL GRAIN COMPANY DEPENDENT LIFE INSURANCE PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

CONTINENTAL GRAIN COMPANY RETIREMENT PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

CONTINENTAL GRAIN COMPANY ACCIDENTAL DEATH INSURANCE PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

CONTINENTAL GRAIN COMPANY TRAVEL ACCIDENT PLAN
C/O General Counsel
Continental Grain Company
277 Park Avenue
New York, New York 10172                    New York County

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

JEROME SCARDINO,

                                Plaintiff,                         **Civil Action No.**

    - against -

                                                                   **COMPLAINT**
                                                                    *JURY TRIAL DEMANDED*

CIGNA LIFE INSURANCE COMPANY OF NEW YORK,
CONTINENTAL GRAIN COMPANY LONG-TERM
DISABILITY BENEFIT PLAN, CONTINENTAL GRAIN
COMPANY BASIC LIFE INSURANCE PLAN,
CONTINENTAL GRAIN COMPANY SUPPLEMENTAL
LIFE INSURANCE PLAN, CONTINENTAL GRAIN
COMPANY DEPENDENT LIFE INSURANCE PLAN,
CONTINENTAL GRAIN COMPANY RETIREMENT PLAN,
CONTINENTAL GRAIN COMPANY ACCIDENTAL
DEATH INSURANCE PLAN, and CONTINENTAL
GRAIN COMPANY TRAVEL ACCIDENT PLAN,

                                Defendants.

-------------------------------------------------------------------------X

Plaintiff, Jerome Scardino, by his attorneys, Binder & Binder, P.C., for his

complaint against the defendants CIGNA Life Insurance Company of New York

("CIGNA")[1] and the Continental Grain Company Long-Term Disability Benefit Plan (the

"LTD Plan"), Continental Grain Company Basic Life Insurance Plan, Continental Grain

Company Supplemental Life Insurance Plan, Continental Grain Company Dependent

Life Insurance Plan, Continental Grain Company Retirement Plan, Continental Grain

Company Accidental Death Insurance Plan and Continental Grain Company Travel

Accident Insurance Plan (collectively, the "other Plans"), alleges as follows:

---

[1] According to Jessie Barsin, A.V.P of the ContiGroup Companies, Inc., her company is the successor of
the Continental Grain Company, and CIGNA succeeded to the Administration Agreement dated April 1,
1980, between Continental Grain Company and The Equitable Life Assurance Society of the United
States.

## JURISDICTION AND VENUE

1.        Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f), which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan.  In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

2.        Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), the long term disability plan at issue in this litigation must contain provisions for the administrative or internal appeal of a denial of benefits. Plaintiff has exhausted all administrative avenues of appeal because he has not received a final determination in accordance with the time limitations established by ERISA regulations.  Nor was Plaintiff notified that additional time was needed to evaluate his claim.  Thus, Plaintiff's claim is deemed denied, and this matter is properly before this court for *de novo* judicial review.  Moreover, the LTD Plan Trust does not provide a grant of discretion to the Plan Administrator, subjecting Plaintiff's claim to *de novo* review.

3.        Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2), which allows an action under Title I of ERISA to be brought in the district where the long term disability plan is administered, where the breach took place, or where a defendant resides or may be found.

## NATURE OF ACTION & JURY DEMAND

4.        This action seeks to recover long term disability income benefits pursuant to the terms and conditions of an employee welfare benefit plan.  As the relief sought is monetary in nature, pursuant to *Great-West Life v. Knudson*, 534 U.S. 204 (2002), Plaintiff requests a trial by jury.  Continental Grain Company, which is now ContiGroup Companies, Inc. (the "Employer"), established the LTD Plan on April 1,

2

1980, and maintains it to provide for group long term disability benefits. The Employer established, and delegated to, an "Administrative Committee," various fiduciary and administrative responsibilities.[2] As the LTD Plan is an employee benefit welfare plan established and maintained by an employer or employee organization for the benefit of its employees, ERISA applies to this action. Said benefits were effective at all times relevant herein.

## THE PARTIES

5.      Plaintiff was born on July 19, 1945, is presently 59 years old, and is a resident of Seaford, New York.

6.      Upon information and belief, Defendant, LTD Plan, is sponsored by the Employer. According to the "Options" summary plan description (the "SPD") dated January 1, 1993, the Employer pays the cost for basic disability coverage, while the employee can elect to pay for supplemental disability coverage under the LTD Plan. The SPD also states that the Employer and employee make contributions to the LTD Plan Trustee, which is The Northern Trust Co., 50 LaSalle Street, Chicago, Illinois 60675.   According to the LTD Plan, its Trust Fund consists of the properties held by the Plan Trustee from Employer and employee contributions.

7.      CIGNA is a business organization licensed to conduct the business of insurance in the State of New York. According to CIGNA, benefits under the LTD Plan are provided through a group insurance contract, NHD 8362 (the "Policy"), that CIGNA issued to Continental Grain.

## STATEMENT OF FACTS

8.      Prior to and including February 7, 1994, Plaintiff worked as comptroller for the Employer for over a decade.  Prior to and including February 7,

---

[2] According to § 2.1 of the LTD Plan, the Administrative Committee is the Plan Administrator and a fiduciary under ERISA.

3

1994, Plaintiff, together with other regular employees of the Employer, was covered as a participant under the LTD Plan.

## Basic Plan Terms

9. The LTD Plan provides for payment of monthly income benefits to participants of the LTD Plan who become disabled. The Employer maintains a trust fund to fund benefits, and the name of the current Plan Trustee is The Northern Trust Co. According to the SPD, the monthly benefit is based on a set percentage of pre-disability eligible compensation, 50% with a potential supplemental benefit of 16.67%, and is reduced by other income benefits as these terms are identified in the LTD Plan. The maximum benefit period under the LTD Plan for a disability that began prior to age 61 is to age 65. According to the SPD, while an employee qualifies for long term disability coverage, the Employer pays the full cost for the employee's coverage under the Basic, Supplemental and Dependent Life Insurance Plans, the Retirement Plan and Accidental Death and Travel Accident Insurance Plans. According to the LTD Plan, the Administrative Committee determines whether an employee is totally disabled.

10. According to the SPD, the LTD Plan provides disability benefits:

For the first 24 months if you cannot perform the duties of your regular job; and

Thereafter, generally up to age 65, if you cannot work at any job for which you are or may become suited for by education, training or experience.

## Vocational Background

11. Plaintiff worked steadily for his entire life, nearly 30 years, before filing for long term disability in 1994.

4

12.     For the last fourteen years of his career, Plaintiff worked for the Employer as its comptroller. Plaintiff's duties included: (a) directing financial activities of the Employer; (b) preparing, using computer or calculator, and directing preparation of, reports which summarized and forecasted the Employer's business activity and financial position in areas of income, expenses, and earnings, based on past, present, and expected operations; (c) determining depreciation rates to apply to capital assets; (d) establishing or recommending, to the Employer's management, major economic objectives and policies; (e) managing the accounting department; (f) directing the preparation of budgets; (g) preparing reports required by regulatory agencies; (h) advising management on desirable operational adjustments due to tax code revisions; (i) arranging for audits of company accounts; (j) advising management about property and liability insurance; and (k) directing financial planning, procurement, and investment of funds.

13.     According to the Employer, Plaintiff's job required being detailed oriented, which necessitated visual acuity and accommodation for eye adjustment and clarity doing near work. Plaintiff's job also required him to supervise others, and to direct all aspects of financial reporting. Plaintiff worked for 40 hours a week, and he reported to the Employer's Senior Vice President & General Manager. The Employer also confirmed that Plaintiff's job required him to stand for an hour a day, walk for an hour a day, and sit for 6 hours a day.

14.     In February 1992, Plaintiff injured his back when he fell off of his roof, but he continued to work, despite continuing and worsening pain.

15.     On February 7, 1994, Plaintiff finally stopped working because his radiating low back pain had become too severe to enable him to continue performing his work duties. On February 9, 1994, Plaintiff tried returning to work. Despite his best efforts, he was unable to fulfill his work duties due to his medical condition, and he had to stop working after only working for 3 hours.

## Social Security

16.     On January 25, 1995, the Social Security Administration (the "SSA") concluded that Plaintiff was totally disabled as of February 7, 1994, and awarded him monthly disability benefits of $1210. The SSA determined that Plaintiff's impairments were so severe that he was unable to engage in any kind of substantial gainful work. Plaintiff's condition was so obviously disabling that he was awarded his Social Security Disability benefits without even having to proceed to an administrative hearing.

17.     Although advised of the SSA's favorable decision, CIGNA arbitrarily dismissed the Social Security award as irrelevant.

## Medical Records & CIGNA's Administrative Review

18.     Two months after he stopped worked, Plaintiff had diagnostic testing that revealed the severity of his back condition. On April 20, 1994, Plaintiff had an EMG that showed he had bilateral radiculopathy[3] at the L4 level. That same date, Plaintiff also had a lumbar MRI done, which confirmed degenerative changes at the L4-5 level.

19.     Plaintiff's treating orthopedist was Donald Kurth. On 6/17/94, Dr. Kurth concluded that Plaintiff should not return to work until July 15, 1994, due to back sprain, osteoarthritis[4] and scoliosis[5].

---

[3] Radiculopathy is a diseased condition of the roots of spinal nerves. Taber's Cyclopedic Medical Dictionary, 17th ed. (1993)(hereinafter, "Taber's").
[4] According to Taber's, "osteoarthritis" is a chronic weight bearing joint disease.
[5] According to Taber's, "scoliosis" is a lateral curvature of the spine.

6

20.     On July 11, 1994, Plaintiff advised CIGNA that he could not perform his job duties due to back pain, seizure black outs, and an inability to concentrate and focus.

21.     On July 22, 1994, Dr. Kurth concluded that in an 8 hour day, Plaintiff was limited to sitting and walking for an hour, and standing for 2 hours. Dr. Kurth also concluded that Plaintiff should not lift or carry even 10 lbs at work.

22.     On August 1, 1994, Dr. Kurth concluded that Plaintiff was unable to work because his back impairments were causing severe back pain and right leg numbness, and his back problems were complicated by his seizure disorder. Holes had been drilled into Plaintiff's skull when he was a child in order to release pressure from encephalitis,[6] and Plaintiff had experienced seizures of different types since childhood. Dr. Kurth stated the Tegretol that Plaintiff was taking for his seizure disorder made him drowsy and unable to concentrate,[7] and that the stress of working under those conditions would exacerbate his back condition.

23.     On August 9, 1994, CIGNA concluded that Plaintiff was totally disabled, by comparing his job requirements to Dr. Kurth's opinion of Plainitff's limitations. CIGNA stated that Plaintiff should be **"followed closely for improvement."**

24.     On August 11, 1994, CIGNA approved Plaintiff's LTD benefits under the any occupation definition of disability.

25.     On August 22, 1994, CIGNA's rehabilitation specialist concluded that vocational rehabilitation for Plaintiff was "not realistic based on medical status."

---

[6] According to Taber's, "encephalitis" is inflammation of the brain.
[7] According to Physicians' Desk Reference Health,
http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/teg1430.shtml, drowsiness is a common side effect of Tegretol.

7

26.     On November 2, 1994, a brain MRI revealed a Dandy-Walker type malformation.[8]

27.     On November 28, 1994, Dr. Kurth advised CIGNA that Plaintiff was totally disabled from any occupation, not only his occupation as a comptroller.

28.     On December 8, 1994, June 15, 1995, and January 24, 1996, CIGNA found that Plaintiff remained totally disabled as his condition had not improved, and paid Plaintiff's LTD benefits based upon the medical information that it had received.

29.     On March 4, 1996, Dr. Ira Turner, a board certified neurologist, informed CIGNA that Plaintiff's seizure disorder frequently caused "spells."

30.     On April 26, 1996, CIGNA notified Plaintiff that the definition of disability under the LTD Plan would change from own occupation to any occupation.

31.     On May 4, 1996, at CIGNA's request, Plaintiff completed a disability questionnaire, in which he explained that he was unable to do his job duties due to back pain, seizure black outs, and an inability to concentrate and focus.

32.     On June 17, 1996, CIGNA asked Ernie Eisenberg, Plaintiff's chiropractor, for his opinions regarding Plaintiff's residual functional capacity. Dr. Eisenberg concluded that Plaintiff was limited to sitting and walking 1 hour a day and standing 2 hours, which was exactly what Dr. Kurth had concluded.

33.     In September 1996, without any explanation, Scott Ramaley, a CIGNA claims handler suddenly concluded that there was no support for Plaintiff's total

---

[8] According to the National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/dandywalker/dandywalker.htm, symptoms of Dandy Walker syndrome include increased head circumference, bulging at the back of the skull, problems with the nerves that control the eyes, face and neck, and abnormal breathing patterns.

8

disability, even though no doctor had ever indicated that Plaintiff's impairments had improved. Ramaley asked "Smith," who was not identified by first name or title, if a functional capacity examination ("FCE") was needed, to which Smith wrote, "Good Idea!"

34. On January 22, 1997, "Smith" concluded that there was no medical evidence to support Plaintiff's total disability, even though no doctor had ever indicated that Plaintiff's impairments had improved. Nor did "Smith" explain how the medical evidence, which CIGNA determined had supported Plaintiff's total disability for the prior 3 years, no longer supported total disability. Moreover, neither "Smith" nor anyone else from CIGNA ever informed Plaintiff what evidence would suffice to establish his continued disability.

35. On May 6, 1997, Mr. Ramaley terminated Plaintiff's LTD benefits on the grounds that on February 24, 1997, Dr. Douglas Barkin, who had become Plaintiff's treating orthopedist, supposedly released Plaintiff to do sedentary to light work. Notably, CIGNA failed to produce Dr. Barkin's February 24, 1997 report when Plaintiff requested a copy of his entire claim file.

36. Less than a month after CIGNA terminated Plaintiff's benefits on the grounds that Dr. Barkin supposedly had released Plaintiff to return to work, on June 4, 1997, Dr. Barkin concluded that Plaintiff remained totally disabled due to back sprain and osteoarthritis. Furthermore, on August 11, 1997, Dr. Barkin reiterated that Plaintiff remained totally disabled due to back sprain and osteoarthritis.

37. On June 3, 1997, Plaintiff informed CIGNA that he never received a termination letter, and only learned about the adverse determination through his the

Employer. At the same time, Dr. Barkin requested more treatment for Plaintiff due to lack of improvement, but CIGNA refused to authorize additional treatment.

38.    On June 4, 1997, Plaintiff appealed the termination, and his benefits were extended to August 1, 1997.

39.    On July 15, 1997, CIGNA told the Employer that Plaintiff's claim was being reviewed.

40.    On September 5, 1997, Mr. Ramaley stated that he would follow up with review of Plaintiff's claim, and that benefits should not be stopped. Thereafter, there was no action on Plaintiff's claim file for more than three years.

41.    On November 27, 2000, Dr. Ronald Klinger, a board certified neurologist, examined Plaintiff. Because Plaintiff was experiencing seizures nearly every day, Dr. Klinger prescribed Neurontin[9] in addition to Tegretol.

42.    On April 26, 2001, the Employer notified Casandra Brown of CIGNA that Plaintiff's daughter turned 18 years of age, because it would reduce the Social Security offset due to the elimination of auxiliary benefits. Ms. Brown told the Employer that the claim was "closed" on April 21, 1997. The Employer reminded Ms. Brown that Plaintiff had appealed in September 1997, and that benefits were not stopped. The Employer told Ms. Brown that medical records should be requested "before we stop him again." Ms. Brown argued that the claim was closed, and that medical records could not be requested on a closed claim. The Employer replied that Mr. Ramaley's note of September 5, 1997, stated that benefits would not be stopped

---

[9] According to Physicians' Desk Reference Health,
http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/neu1289.shtml, when Neurontin is taken for seizures, common side effects include: vision problems and involuntary eye movement, dizziness, drowsiness, fatigue, lack of muscular coordination, nausea, and tremor.

during CIGNA's appeal review, and that there was no follow up relating to the termination.

43.     On May 2, 2001, the Employer reiterated its request for information, and advised Ms. Brown that, "there is nothing in the file from CIGNA to notify him that benefits would be stopped."

44.     On May 9, 2001, the Employer wanted to discuss Plaintiff's claim with Ms. Brown, but she refused to reopen it.

45.     On May 11, 2002, the Employer told Ms. Brown that if Plaintiff's LTD benefits were stopped, then he would sue somebody.

46.     After reviewing what had happened to Plaintiff's claim since it was denied, the Employer stated that medical records should be requested "before we stop him again.

47.     Ms. Brown refused to obtain medical records because CIGNA had "closed" the claim, and Ms. Brown refused to reopen the claim or even discuss it, until the Employer said Plaintiff would sue if his benefits were terminated; Ms. Brown contradicted herself and went through the motions of providing Plaintiff with a full and fair claim evaluation by agreeing to obtain updated medical information.

48.     On May 11, 2001, Ms. Brown sought medical records from Dr. Ronald Klinger, board certified neurologist, Dr. Eisenberg and Dr. Malvin Goldner, a board certified family practitioner, to see if Plaintiff remained totally disabled from any occupation.

49.     On June 7, 2001, Michelle Dunn Foster, CIGNA's nurse, asked Ms. Brown what to do with Plaintiff's file because it appeared closed in 1997.

11

50.     On June 13, 2001, Ms. Foster confirmed that CIGNA failed to perform an appeal review. Ms. Foster noted that: (a) for over two years, CIGNA paid Plaintiff long term disability benefits because his back condition precluded him from performing his sedentary occupation; (b) the SSA awarded Plaintiff disability benefits at the initial application stage; (c) Plaintiff's seizure disorder and medications did not "appear" to affect his back, (d) Plaintiff's pain was chronic, and (e) a treating doctor indicated possible depression and need for pain management. Most importantly, **Ms. Foster concluded that Plaintiff's condition never changed and that no doctor ever released Plaintiff to return to work.** Ms. Foster advised that Plaintiff's claim be referred to Dr. Franz.

51.     Two weeks later, on June 27, 2001, Ms. Foster referred Plaintiff's file to Thomas Franz, a physiatrist. Ms. Foster stated that Plaintiff's diagnoses were back sprain and osteoarthritis with radiculopathy, but neglected to mention anything about seizures. The referral noted the FCEs had unclear results, (and CIGNA failed to produce the FCE's when Plaintiff requested a copy of the entire claim file). Ms. Foster said Plaintiff's functional capacity was limited to sitting, standing and walking for 2 hours a day, which was the rationale for claim closure.

52.     On August 6, 2001, Dr. Franz stated that low back pain and medications restricted Plaintiff's ability to work, and that the seizure medications also made treatment difficult.

53.     On August 15, 2001, Ms. Foster stated that Dr. Franz restricted Plaintiff due to back pain and medications, and recommended follow up with medical updates on a 6 to 12 month basis. CIGNA failed to produce a copy of Dr. Franz's

dictation when Plaintiff requested a copy of the entire claim file. Ms. Brown noted that Dr. Franz's opinion was supportive of Plaintiff's claim.

54.     On August 21, 2001, Ms. Brown stated that the medical records proved that Plaintiff "is not capable of performing any work at this time." Later that day, Ms. Brown told Plaintiff that his disability benefits had been continued.

55.     On July 8, 2002, at Dr. Goldner's request, Dr. Harvey Orlin, a board certified orthopaedic surgeon, examined Plaintiff, and diagnosed him with lumbar radiculopathy, sprain and severe osteoarthritis at the L4-S1 levels.

56.     On July 11, 2002, Dr. Eisenberg completed CIGNA's Attending Physician Statement ("AP form") restricted Plaintiff to walking, standing, and sitting for 0 hours a day, and emphatically concluded Plaintiff was totally disabled.

57.     On July 16, 2002, Dr. Orlin completed an AP form, and restricted Plaintiff to sitting and standing for 0 hours a day and walking for up to 2.5 hours a day. Dr. Orlin indicated that Plaintiff was totally disabled, could never return to any type of work, and suffered memory deficits.

58.     On July 24, 2002, Ms. Brown noted that Drs. Orlin and Eisenberg stated that Plaintiff can never work.

59.     On July 29, 2002, Ms. Brown stated that Dr. Klinger and Dr. Goldner's medical records documented Plaintiff's low back pain and seizure disorder.

60.     On August 23, 2002, Dr. Eisenberg limited Plaintiff to sitting, walking and standing less than 2.5 hours a day.

61.     An August 31, 2002 lumbar MRI revealed that Plaintiff had disc desiccation and narrowing, along with a disc bulge, at the L3-4 level that was narrowing

the lateral recesses.  At the L4-5 level, the MRI revealed a broad based disc bulge that was flattening the sac and encroaching the lateral recess at L4-5.

62.   On September 23, 2002, Ms. Brown referred Plaintiff's file to a rehabilitation specialist after receiving Dr. Orlin's medical records, even though Dr. Orlin made it clear that Plaintiff was totally disabled and could never return to any type of work.

63.   On October 2, 2002, CIGNA's Marion Reznik did a transferable skill analysis, notwithstanding the fact that not only had Plaintiff's occupation been sedentary, but no doctor, including CIGNA's doctor, ever opined that Plaintiff was capable of sedentary work.

64.   On November 8, 2002, Dr. Sebastian Lattuga, a board certified orthopedist, examined Plaintiff.  Dr. Lattuga noted that Plaintiff exhibited neurological deficits in the L4-S1 distribution.  Dr. Lattuga diagnosed Plaintiff with lumbar stenosis[10] and radiculopathy.

65.   On November 12, 2002, Ms. Foster noted that none of the treating doctors -- not Dr. Orlin, Eisenberg, Klinger nor Goldner -- had concluded that Plaintiff could return to work or had a sedentary work capacity.  Moreover, Ms. Foster said, **"Finally, I do not feel that the cx's medical information has changed.  As such, I think that the previous physician assessment of functional limitations preventing even sedentary work would appear to continue to be accurate."**

66.   On December 19, 2002, a conspicuously unidentified doctor said that the medical information does not support Plaintiff's claim.  Notably, the unnamed

---

[10] Spinal stenosis is the narrowing of the spinal canal and it causes back and leg pain.  Harrison's, Principles of Internal Medicine, Ch. 16, *Neck and Back Pain*, (14th Ed. 1998).

doctor failed to identify what medical information or condition had changed since Dr. Franz's medical review the prior year.

67.     On January 9, 2003, CIGNA's Diane Daugherty reviewed Plaintiff's claim. Ms. Daugherty acknowledged that Dr. Orlin concluded Plaintiff lacked a sedentary work capacity, but said that the file did not document that Plaintiff's seizure medications were causing poor concentration.

68.     Ms. Daugherty failed to explain why she ignored Dr. Kurth's statement, that the Tegretol that Plaintiff was taking for his seizure disorder made him drowsy and unable to concentrate, and why she failed to consult the Physician's Desk Reference or any other medical source regarding the side effects of Plaintiff's medications.

69.     On March 21, 2003, Ms. Daugherty told the Employer that a peer review was needed, and Ms. Daugherty prepared the questions for the peer review. Those questions were not produced when Plaintiff requested a copy of his entire claim file.

70.     On May 20, 2003, after one medical review referral service called Mednostic inexplicably refused to accept Plaintiff's claim file, another medical review referral service called Paraferrals accepted it, which referred the file to Dr. Alan Strizak, who is a medical director for several insurance carriers.[11]

71.     Dr. Strizak never examined, met or even spoke with Plaintiff.

---

[11] Alan Strizak, M.D., had to appear before the Texas State Board due to malpractice claims and alleged falsification of his licensure application. According to the American Medical Association, Dr. Strizak is licensed in California. It is unclear whether Dr. Strizak has lost or been denied a license in other jurisdictions.

15

72.     On June 7, 2003, Dr. Strizak stated the "objective medical data" failed to support Plaintiff's claim.  Dr. Strizak failed:

(a) to explain what "objective" medical data, which previously had supported Plaintiff's claim, no longer supported it;

(b) to identify objective medical data that showed Plaintiff's medical conditions had improved since Dr. Franz's review;

(c) to identify what medical data was objective and what was subjective;

(d) to discuss the impact of Plaintiff's medications on his ability to work (Dr. Strizak concluded that Plaintiff is under medicated, which means that his side effects would be even **greater** if Dr. Strizak were correct and medications were increased);

(e) to mention that each of Plaintiff's treating doctors concluded Plaintiff was totally disabled;

(f) to explain why each of Plaintiff's treating doctors' conclusions regarding Plaintiff was erroneous; and

(g) to identify any treatment, that any treating doctor was providing, that was inappropriate.  Dr. Strizak claimed that Plaintiff was playing a "sick role," but failed to identify any evidence whatsoever to support that assertion.  Dr. Strizak claimed that Dr. Orlin was uncooperative.  However, Defendants never offered to pay Dr. Orlin for his time.

73.     Dr. Strizak concluded that Plaintiff was limited to standing, sitting and walking 2.5 hours at best.

74.    CIGNA never provided a copy of Dr. Strizak's report to Plaintiff's treating doctors for their comments.

75.    On July 21, 2003, Ms. Daugherty said that, based on Dr. Strizak's report, the medical evidence did not support Plaintiff's disability. Ms. Daugherty failed to explain what "objective" medical data, which previously had supported Plaintiff's claim, no longer supported it. Ms. Daugherty failed to explain what medical evidence showed that Plaintiff's medical conditions had improved since Dr. Franz's review. Ms. Daugherty ignored the impact of Plaintiff's medications on his ability to work. Ms. Daugherty ignored that each of Plaintiff's treating doctors concluded Plaintiff was totally disabled. Ms. Daugherty failed to explain why each of Plaintiff's treating doctors' conclusions regarding Plaintiff was erroneous. Ms. Daugherty failed to provide any reason for accepting Dr. Strizak's opinion to the exclusion of each of Plaintiff's treating doctors, as well as Dr. Franz.

76.    A July 22, 2003 MRI of Plaintiff's brain revealed atrophy.

77.    On August 26, 2003, Ms. Brown discussed the file with CIGNA's Scott Parker and Ms. Daugherty, and they determined that Plaintiff could do his own occupation.

78.    Plaintiff's treating specialists continued to conclude that he was incapable of performing the physical requirements of sedentary work. On September 10, 2003, Dr. Orlin's AP form restricted Plaintiff to 0 hours of standing and only up to 2.5 hours of walking and sitting a day. Similarly, on September 22, 2003, Dr. Eisenberg's AP form limited Plaintiff to 0 hours of walking, sitting, and standing, and reiterated that Plaintiff was totally disabled and not able to work.

79.     By letter dated October 21, 2003, CIGNA terminated Plaintiff's benefits because Dr. Orlin's July 26, 2002 functional capacity assessment supposedly showed that Plaintiff had a sedentary work capacity.  However, CIGNA determined that Plaintiff was totally disabled after reviewing Dr. Orlin's July 26, 2002 report when it was submitted the previous year.

80.     In terminating Plaintiff's benefits on October 21, 2003, CIGNA failed to explain why it had relied on Dr. Orlin's assessment dated July 26, 2002.

81.     In terminating Plaintiff's benefits on October 21, 2003, CIGNA failed to explain why it completely disregarded Dr. Orlin's current assessment dated September 10, 2003, which had restricted Plaintiff to 0 hours of standing and only up to 2.5 hours of walking and sitting a day.

82.     On October 24, 2003, CIGNA told the Employer that Plaintiff's benefits were terminated as of October 13, 2003.

83.     On December 9, 2003, Plaintiff told CIGNA the termination was based on inaccurate information because it: failed to consider his memory loss or that his seizures had increased in frequency and remained uncontrolled; erroneously claimed that Dr. Orlin's functional assessment provided a sedentary work capacity; and no more aggressive treatment or pain management was possible due to problems with drug interaction and side effects (which is what Dr Franz stated).

85.     On March 3, 2004, CIGNA's Brenda Bartlett explained that benefits were terminated because "Dr. Orlin provided sedentary limitations and restrictions" that were confirmed by an unnamed "physician specializing in orthopaedic surgery."

86.    On April 1, 2004, Plaintiff requested a copy of his "<u>entire</u>" claim file
from Ms. Bartlett.

87.    On May 12, 2004, Plaintiff submitted reports from his treating
physician, Dr. Julius Bazan, who is a board certified neurologist, and treating physician
Dr. Victor Katz, who is a board certified physiatrist.  Plaintiff also submitted his April 27,
2004 lumbar MRI.

88.    On May 3, 2004, Dr. Bazan stated that Plaintiff's seizures were not
under control at all.  Plaintiff had tried every conceivable medication with multiple side
effects, and he pointed out that Plaintiff's brain MRI revealed severe atrophy.  Dr. Bazan
concluded that Plaintiff was totally and permanently disabled from a neurological point
of view due to continuous daily seizures with poor control and complete intolerance for
most of the medications tested.  Regarding Dr. Strizak, Dr, Bazan advised that Plaintiff
had an orthopedic:

> evaluation by Dr. Alan Strizak who resides in California and had
> never seen the patient.  This physician has absolutely no competence
> in evaluating seizure disorder and has complete lack of understanding
> of seizure pattern of Mr. Jerome Scardino.

89.    Plaintiff's April 27, 2004 lumbar MRI revealed numerous severe
impairments.  Among other things, at the L4-5 level, there was severe disc narrowing
and desiccation resulting in stenosis and subluxation, along with spondylytic ridging and
bulging disc material and large herniated disc extruding into the right neural foramen
where it impinges the nerve root.  At the L3-4 level, there was a broad based herniated
disc that bilaterally extended into the neural foramina and crowded the L3 nerve root.

90. On April 30, 2004, Dr. Katz's objective clinical examination findings included severely decreased ranges of back motion, muscle spasms, positive straight leg raises,[12] and sensory deficits. Dr. Katz stated that a comparison of the 2002 and 2004 lumbar MRIs shows that Plaintiff's condition has gotten significantly worse. Dr. Katz's diagnoses were severe disc degeneration, lumbar radiculopathy and stenosis, and dynamic instability at the L4-5 level. Dr. Katz concluded that Plaintiff could not do his prior work as an accountant, and was totally and permanently disabled from performing any work duties.

91. On May 28, 2004, Plaintiff advised CIGNA that while the records submitted on May 12, 2004 demonstrated his entitlement to benefits, additional records would be submitted. Plaintiff asked CIGNA, in accordance with 29 C.F.R. §2560.503(g)(1), to describe any additional information that CIGNA believed was necessary.[13]

92. On June 11, 2004, CIGNA's Noemi Landis failed to comply with 29 C.F.R. §2560.503(g)(1), and refused to describe any additional information that it believed was necessary to evaluate Plaintiff's claim. Ms. Landis represented that Plaintiff's appeal would be resolved within 30 days of receiving the additional information.

---

[12] According to American Family Physician (1999), Clinical Evaluation and Treatment Options for Lumbar Herniated Disc, available at http://www.aafp.org/afp/990201ap/575.html, "The straight-leg raising test is performed with the patient in the supine position. The physician raises the patient's legs to approximately 90 degrees. Normally, this position results in only minor tightness in the hamstrings. If nerve root compression is present, this test causes severe pain in the back of the affected leg and can reveal a disorder of the L5 or S1 nerve root."
[13] Section 7.11.3 of the LTD Plan requires the Administrative Committee to provide a claimant with, "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why the material or information is necessary".

93.     On June 14, 2004, CIGNA's Brenda Bartlett informed Plaintiff that his appeal had been transferred to CIGNA's Dallas, TX office, and that his appeal would be resolved within 30 days of receiving the additional information.

94.     On September 23, 2004, Plaintiff submitted an updated report from Dr. Eisenberg and a report from Plaintiff's treating family physician, Dr. Gary Rachlin. Plaintiff reiterated that if CIGNA alleged Dr. Rachlin's, Dr. Eisenberg's, Dr. Bazan's and Dr. Katz's reports were insufficient to establish Plaintiff's entitlement to benefits, then to specify what additional information it believed was necessary or that Plaintiff had neglected to obtain.

95.     On May 14, 2004, Dr. Eisenberg noted the positive clinical tests and findings supporting Plaintiff's lumbar diagnoses. Like Dr. Katz, Dr. Eisenberg stated that a comparison of Plaintiff's 2002 and 2004 lumbar MRIs shows that his condition has clearly worsened. Dr. Eisenberg rejected Dr. Strizak's contention that Plaintiff was not totally disabled and unable to perform any type of work, and criticized Dr. Strizak's report which was prepared without a physical examination.

96.     On July 12, 2004, Dr. Rachlin advised that Plaintiff was taking Synthroid, Bextra, Kepra and Zoloft in addition to Tegretol, and that Plaintiff was now also diagnosed with hypothyroidism. Dr. Rachlin concurred with the assessments of Plaintiff's specialists that Plaintiff was permanently disabled.

97.     CIGNA failed to request any additional information from Plaintiff, and it failed to identify any additional information it believed was necessary for Plaintiff to establish his claim. CIGNA failed to resolve Plaintiff's appeal within 30 days as promised, nor did CIGNA communicate at all with Plaintiff.

## PLAINTIFF'S CAUSE OF ACTION
## FOR LONG TERM DISABILITY BENEFITS

98.     Plaintiff repeats each and every allegation contained in paragraphs
1 through 97 as if set forth fully herein.

99.     Fiduciaries are statutorily obligated to perform their duties
prudently, solely in the interest of plan participants and beneficiaries, and strictly in
conformance with the provisions of the Plan. Fiduciaries also have a statutory
obligation to interpret and construe the terms of the plan fairly, and make decisions in
accordance with plan language.

100. The LTD Plan has not made any decisions concerning Plaintiff's
claim for LTD benefits. CIGNA, which upon information and belief has a pecuniary
interest in denying claims, made the administrative claim decisions.

101. CIGNA's decisions were not premised upon the terms and
definitions of the LTD Plan as described by the Summary Plan Description.

102. CIGNA's decisions were not supported by the medical evidence, did
not apply the language of the LTD Plan, and were tainted by conflict of interest.

103. Plaintiff was and remains disabled within the terms and conditions of
the LTD Plan; therefore, Plaintiff is entitled receive monthly LTD benefits from October
13, 2003 to the present.

104. As Plaintiff was and remains disabled within the terms and
conditions of the LTD Plan; Plaintiff is entitled to continued coverage at the benefit level
in effect at the time of his disability under the other Plans.

## DEMAND FOR TRIAL BY JURY

105. Plaintiff demands a trial by jury of all issues triable as of right.

**WHEREFORE,** Plaintiff respectfully requests this Court to:

22

Case 1:05-cv-02615-KMK Document 1 Filed 03/07/05 Page 25 of 25

A.     Declare and determine that under the terms of the LTD Plan, that Plaintiff's disability did not end on October 13, 2003, and that he continues to be disabled under the LTD Plan;

B.     Declare and determine that under the terms of the LTD Plan, that Plaintiff's coverage under the other Plans continues during the period of Plaintiff's disability under the LTD Plan;

C.     Order Defendants to compensate Plaintiff for his disability in accordance with the terms of the LTD Plan;

D.     Award Plaintiff his attorneys' fees pursuant to 29 U.S.C. § 1132(g); and

E.     Grant Plaintiff such other necessary and proper relief, including interest, costs and disbursements, as to which he may be entitled.

Dated:  Ronkonkoma, NY
        March __l__ , 2005


                                        BINDER & BINDER P.C.

                                        By:  _____
                                             Harry J. Binder (HJB 5450)
                                             Attorneys for Plaintiff
                                             2805 Veterans Memorial Highway
                                             Ronkonkoma, NY 11779
                                             (631) 361-6699

23